**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | | |
|---|---|---|
| KYLE BUTLER RASHLEY<br>and<br>NICHOLAS DUNGEY,<br>on behalf of<br>themselves and<br>all others similarly situated, | :<br>:<br>: | Case No. 1:25-cv-21690-KMW<br>Judge Kathleen Williams |
| Plaintiffs/Counter-Defendants, | | Magistrate Judge Jonathan Goodman |
| v. | :<br>: | |
| BOOST HEALTH INSURANCE, INC., | : | |
| Defendant/Counter-Plaintiff. | : | |

**<u>BOOST HEALTH INSURANCE AGENCY, INC.'S</u>**
**<u>FIRST AMENDED COUNTERCLAIM AGAINST</u>**
**<u>PLAINTIFFS/COUNTER-DEFENDANTS RASHLEY & DUNGEY</u>**

COME NOW Counter-Plaintiff Boost Health Insurance Agency, LLC (improperly identified in Plaintiffs' Complaint as "Boost Health Insurance, Inc."), by and through undersigned counsel, and as a matter of course pursuant to Fed. R. Civ. P. §15(a)(1)[1] files its Amended Counterclaim against Plaintiffs/Counter-Defendants, Kyle Butler Rashley ("Rashley") and Nicholas Dungey ("Dungey") (collectively the "Counter-Defendants") and states as follows:

1. Counter-Defendants are parties to this action and have appeared before the Court.

2. This Court has jurisdiction and venue over the Counter-Defendants insofar as this Court has jurisdiction and venue over their claims asserted against Boost herein.

---

[1] Defendant/Counter-Plaintiff's First Amended Counterclaim is filed within 21 days of the filing of DE 11on July 8, 2025.

3. Boost denies liability for the claims asserted by the Counter-Defendants and the putative class in this case and requests that all claims be dismissed.

4. For its First Amended Counterclaims, Boost states as follows:

**Factual Allegations**

5. Boost owns and maintains the website – www.findyourhealthplan.org.

6. This website allows consumers who are interested in obtaining health insurance to provide certain personal information in order to generate quotes for available health insurance products.

7. Boost controls the website and does not use any third parties to drive traffic to it or otherwise allow any third parties to access it.

8. The first page of the website clearly displays detailed language pursuant to which the consumer provides consent to Boost for it to contact the consumer through a telephone call, text message, or email.

9. That consent language which is intentionally placed on the website's first page at the beginning of the submission form states:

> *By pressing the continue button (1) you understand that using an electronic signature to express written consent to receive emails, telephone calls, text messages, artificial or pre-recorded messages from Boost Health Insurance, its affiliates, and/or any third-party partners (or service provider partners on their behalf), (2) you understand that you may be contacted at the email address and/or telephone number you provided, including your wireless phone number (if provided) utilizing an automated telephone dialing system or robocall, even if you are on a government do-not-call registry, and (3) you agree to this website's Privacy Policy and Terms of Use. You acknowledge your understanding that the provision of false information may subject you to liability. You understand that your consent is not required as a condition of purchase and that you may revoke your consent at any time. You may also call 866-978-9230 TTY 711 to speak with a licensed insurance agent directly. Message and data rates may apply. There is no obligation to enroll.*

10. The first page of the website requires consumers to provide their name, email address, and telephone number.

11. The first page of the website includes a "check box" where consumers can provide their consent to electronically sign their name and to be contacted by Boost at the email address and telephone number they provided.

12. The first page of the website also requires the consumer to acknowledge that the provision of false information may subject the consumer to liability. There can be civil and criminal liability for consumers who provide false, inaccurate and/or incomplete information when shopping for and submitting applications for health insurance products.

13. If a consumer does not check the "check box" and no consent is provided, the consumer will not be able to move forward and complete the subsequent pages of the submission form.

14. If a consumer does not check the "check box" and no consent is provided, Boost will not contact the consumer by telephone or in any other fashion.

15. If a consumer does not check that box and no consent is provided, Boost will have no knowledge that the consumer visited the website and, if provided, the name, email address and telephone number will not be retained.

16. If a consumer does check the "check box", thereby providing his or her express consent to be contacted, he/she will be permitted to move forward and complete the subsequent pages of the submission form. The consumer may later be contacted by Boost pursuant to the express consent he/she provided.

17. Upon information and good faith belief, Counter-Defendants engaged Boost's website as well as numerous health insurance and other consumer websites by visiting them and

providing false information (except their real telephone numbers) for the purpose of deceiving those companies into believing they are interested consumers. Thereafter, when companies contact them, they threaten litigation with the ultimate plan to exact money from legitimate companies.

18. Upon information and good faith belief, Counter-Defendants followed the same pattern and practice with Boost, which takes them outside of the zone of protection of state and federal telemarketing laws.

19. This good faith belief is based, in part, on the fact that within the past ten months, Counter-Defendants' counsel filed nine very similar lawsuits alleging violations of the TCPA, state telemarketing laws, and the National Do Not Call Registry. Seven of those lawsuits were filed within the span of just thirty-two days between April 12, 2025 and May 14, 2025. All of those lawsuits are premised on telephone calls and text messages placed to Counter-Defendants between March 17, 2025 and April 17, 2025. The text messages at issue in this lawsuit were received by Counter-Defendants in that same time period between March 28, 2025 and April 3, 2025. All of the aforementioned lawsuits also involve insurance sales agencies, similar to Boost.[2]

20. This good faith belief is also based on the fact that Mr. Dungey, just like Mr. Rashley, used aliases including the names of "Dan" and "Danny" when submitting his personal

---

[2] 25-cv-21690-KMW (filed 4/12/25) (text messages received between 3/28/25 – 4/3/25)
25-cv-80492-RLR (filed 4/23/25) (text messages received between 3/27/25 – 3/31/25)
25-cv-21806-DPG (filed 4/21/25) (telephone calls received between 3/24/25 – 3/26/25)
25-cv-22118-KMW (filed 5/7/25) (telephone calls received between 3/17/25 – 4/4/25)
25-cv-80558-RLR (filed 5/7/25) (text messages received between 3/29/25 – 3/31/25)
25-cv-80587-AMC (filed 5/14/25) (text messages received between 4/9/25 – 4/17/25)

information to certain of the defendants in those lawsuits. These names are not Mr. Dungey's names.

21. This good faith belief is also based on the fact that Mr. Rashley, just like Mr. Dungey, used the alias of "Joey" when submitting his personal information to a defendant in one of those lawsuits. That name is not Mr. Rashley's name.

22. This good faith belief is based on the facts, as set forth below, that within just five days of each other, Mr. Dungey and Mr. Rashley each visited Boost's website, entered false contact information, and entered their real telephone numbers.

**COUNT I**

**FRAUDULENT MISREPRESENTATION**

**(Against Dungey)**

23. Boost restates and incorporates its allegations herein as if fully restated.

24. On March 23, 2025, Mr. Dungey visited Boost's website and entered his real telephone number – (561) 943-0417.

25. On March 23, 2025, when Mr. Dungey visited Boost's website, he did provide consent to be contacted on his real telephone number – (561) 943-0417.

26. Boost possesses a copy of the video replay of Mr. Dungey's 3 minute, 41 second visit to the website on March 23, 2025.

27. On March 23, 2025, while on Boost's website, Mr. Dungey first entered his telephone number – (561) 710-0914. He read the consent language; he deleted that telephone number; and he changed it to the telephone number he has included in this lawsuit – (561) 943-0417.

28. On March 23, 2025, while on Boost's website, Mr. Dungey first entered the address 11830 Courtleigh Drive, Los Angeles. The health insurance products Mr. Dungey was looking for are not available in California. Because of that, the website would not allow Mr. Dungey to proceed with the Los Angeles address. Desiring to move forward with the bogus submission, Mr. Dungey kept the same street address and randomly changed the city and state to New Orleans, Louisiana, where the insurance products he was looking for are available. It is averred that there is no Courtleigh Drive in New Orleans, Louisiana.

29. On March 23, 2025, while on Boost's website, Mr. Dungey entered his name as "Thomas Murphy", which is not Mr. Dungey's name.

30. On March 23, 2025, while on Boost's website, Mr. Dungey entered the email address of tmurph85@yahoo.com, which appears to have an association with the name, "Thomas Murphy". This email address does not belong to Mr. Dungey.

31. Notwithstanding the deceitful acts described in the preceding paragraphs, Mr. Dungey did check the check box expressing his consent to be contacted on his real telephone number – (561) 943-0417.

32. Mr. Dungey's false statement that he consented to being contacted by Boost is material fraudulent misrepresentation..

33. Mr. Dungey knew that he did not want to be contacted by Boost when he represented to Boost that it had his consent to contact him.

34. Mr. Dungey falsely represented to Boost that it had his consent to contact him in order to induce Boost to contact him.

35. Boost contacted Mr. Dungey at the real telephone number he provided in response to his representation that he consented to Boost contacting him.

36. But for Mr. Dungey's provision of consent to be contacted, Boost would not have contacted him.

37. On March 23, 2025, when Mr. Dungey visited Boost's website and provided consent to Boost for it to contact him, he represented that he understood that he may be contacted at the email address and/or telephone number he provided, including his wireless phone number (if provided) utilizing an automated telephone dialing system or robocall, even if he is on a government Do-Not-Call registry.

38. Though Mr. Dungey did not provide all of the information required to complete the submission form, <u>other than his real telephone number</u>, the personal information he did provide was intentionally falsified.

39. On March 23, 2025, Mr. Dungey visited Boost's website from an IP address that was purposefully masked through the use of a VPN.

40. Upon information and good faith belief, Mr. Dungey knew that the use of the VPN would conceal the location of the computers or devices he used while accessing Boost's website on March 23, 2025.

41. This good faith belief is based on the fact that it is generally and publicly known that the use of a VPN conceals certain location and IP address information available on computers and other electronic devices.

42. In providing his real telephone number, Mr. Dungey affirmed his desire to receive communications from Boost at that telephone number, thereby completing the opt-in process.

43. By this conduct, Mr. Dungey also established a business relationship with Boost.

44. On March 24, 2025, in reasonable reliance upon and pursuant to the consent provided by Mr. Dungey the day prior, Boost sent two transactional text messages to the real

telephone number he provided – (561) 943-0417. Those text messages merely inquired into whether assistance was needed to complete the submission form that Mr. Dungey had started but did not fully complete. The text messages included a link to where the submission form could be completed.

45. After receiving the March 24, 2025 text messages, Mr. Dungey did not inform Boost that he was on the National Do Not Call Registry and should not have been contacted. Had Mr. Dungey informed Boost that he was on the National Do Not Call Registry on March 24, 2025, Boost would not have sent any more text messages to him. Mr. Dungey did not inform Boost that he was on the National Do Not Call Registry because he wanted to receive more text messages from Boost.

46. After receiving the March 24, 2025 text messages, Mr. Dungey did not contact Boost to revoke his consent to be contacted because he wanted to receive more text messages from Boost. By not revoking his consent to be contacted on March 24, 2025, Mr. Dungey intentionally misrepresented to Boost that he did consent to being contacted. Had Mr. Dungey revoked his consent on March 24, 2025, Boost would not have sent any more text messages to him.

47. After receiving the March 24, 2025 text messages, Mr. Dungey did not report the text messages as Junk because he wanted to receive more messages from Boost. Had Mr. Dungey reported the text messages as Junk on March 24, 2025, Boost would not have sent any more text messages to him.

48. On March 25, 2025, in reasonable reliance upon and pursuant to the consent provided by Mr. Dungey two days prior, Boost sent one transactional text message to the real telephone number he provided – (561) 943-0417. That text message, just like the text messages sent the day before, merely inquired into whether assistance was needed to complete the

submission form that Mr. Dungey had started but did not fully complete. The text message included a link to where the submission form could be completed.

49. After receiving the March 25, 2025 text message, Mr. Dungey did not inform Boost that he was on the National Do Not Call Registry and should not have been contacted. Had Mr. Dungey informed Boost that he was on the National Do Not Call Registry on March 25, 2025, Boost would not have sent any more text messages to him. Mr. Dungey did not inform Boost that he was on the National Do Not Call Registry because he wanted to receive more text messages from Boost.

50. After receiving the March 25, 2025 text message, Mr. Dungey did not contact Boost to revoke his consent to be contacted because he wanted to receive more text messages from Boost. By not revoking his consent to be contacted on March 25, 2025, Mr. Dungey intentionally misrepresented to Boost that he did consent to being contacted. Had Mr. Dungey revoked his consent on March 25, 2025, Boost would not have sent any more text messages to him.

51. After receiving the March 25, 2025 text message, Mr. Dungey did not report the text message as Junk because he wanted to receive more messages from Boost. Had Mr. Dungey reported the text message as Junk on March 25, 2025, Boost would not have sent any more text messages to him.

52. On March 27, 2025, in reasonable reliance upon and pursuant to the consent provided by Mr. Dungey four days prior, Boost sent one transactional text message to the real telephone number he provided – (561) 943-0417.

53. On March 27, 2025 at 9:53 a.m., Boost sent a text message to Mr. Dungey's real telephone number – (561) 943-0417, stating that the telephone number had been successfully unsubscribed from receiving further communications from Boost.

54. Within just four minutes, at 9:57 a.m. of receiving that text message on his telephone with his real telephone number – (561) 943-0417, Mr. Dungey used his telephone to knowingly and intentionally re-subscribe to receive more text messages from Boost. By re-subscribing, Mr. Dungey affirmatively solicited contact from Boost.

55. By re-subscribing to receive more text messages on March 27, 2025, Mr. Dungey lied to Boost because he did not want to receive more text messages. Had Mr. Dungey not re-subscribed to receiving more text messages, the "unsubscribe" would have remained in effect.

56. After receiving the March 27, 2025 text message, Mr. Dungey did not inform Boost that he was on the National Do Not Call Registry and should not have been contacted. Had Mr. Dungey informed Boost that he was on the National Do Not Call Registry on March 27, 2025, Boost would not have sent any more text messages to him. Mr. Dungey did not inform Boost that he was on the National Do Not Call Registry because he wanted to receive more text messages from Boost.

57. After receiving the March 27, 2025 text message, Mr. Dungey did not contact Boost and revoke his consent to be contacted, as he sought yet again, to receive additional text messages from Boost. By not revoking his consent to be contacted March 27, 2025, Mr. Dungey intentionally misrepresented to Boost that he consented to being contacted.

58. After receiving the March 27, 2025 text message, Mr. Dungey did not report the text message as Junk because he wanted to receive more messages from Boost.

59. That very same day (just four days after Mr. Dungey visited Boost's website and entered real telephone number – (561) 943-0417), one of Mr. Dungey's lawyers (Dana Oliver, Esq. from the Heidarpour Law Firm) notified Boost that Mr. Dungey alleged TCPA and National Do

Not Call Registry claims against Boost. Dana Oliver, Esq. also represents Counter-Defendant Rashley.

60. No telephone calls or pre-recorded messages were sent by Boost to Mr. Dungey's real telephone number – (561) 943-0417.

61. When visiting Boost's website on March 23, 2025, Mr. Dungey acknowledged his understanding that the submission of false information could subject him to liability.

62. When visiting Boost's website on March 23, 2025, Mr. Dungey falsely represented to Boost that he was interested in obtaining health insurance.

63. When visiting Boost's website on March 23, 2025, Mr. Dungey falsely represented that he consented to being contacted by Boost.

64. Mr. Dungey's false statements in this regard were intended to induce Boost to rely on those statements and contact him about health insurance products, even though Mr. Dungey then knew that he did not want health insurance products and did not want to be contacted.

65. The fact that Mr. Dungey was on the National Do Not Call Registry on March 23, 2025 when he visited Boost's website confirms that his consent to be contacted was a misrepresentation.

66. Had Mr. Dungey not lied by representing that he consented to being contacted, Boost would not have sent the text messages that Mr. Dungey now complains of in this lawsuit.

67. By lying that he consented to being contacted, Mr. Dungey fraudulently induced Boost to contact him.

68. Boost contacted Mr. Dungey solely in reasonable reliance on his representation (which was a lie) that he consented to being contacted.

69. Had Mr. Dungey not lied, Boost would not be in the position of having to defend this lawsuit.

70. As a direct result of contacting Mr. Dungey in reasonable reliance on his intentional misrepresentations, Boost has and will continue to suffer reputational damages and will continue to incur attorney's fees and litigation expenses to defend itself in this lawsuit.

**COUNT II**

**FRAUDULENT MISREPRESENTATION**

**(Against Rashley)**

71. Boost restates and incorporates its allegations herein as if fully restated.

72. On March 28, 2025, Mr. Rashley also visited Boost's website and entered his real telephone number – (561) 460-8422.

73. On March 28, 2025, when Mr. Rashley visited Boost's website, he did provide consent to be contacted on his real telephone number – (561) 460-8422.

74. Boost possesses a copy of the video replay of Mr. Rashley's 1 minute, 58 second visit to the website on March 28, 2025.

75. On March 28, 2025, while on Boost's website, Mr. Rashley provided his name as "John Renoylds", which is not Mr. Rashley's name.

76. On March 28, 2025, while on Boost's website, Mr. Rashley also provided an email address of johnr112@gmail.com, which appears to have an association with the name, "John Renoylds". This email address does not belong to Mr. Rashley.

77. Notwithstanding the deceitful acts described in the preceding paragraphs, Mr. Rashley did check the check box expressing his consent to be contacted on his real telephone number – (561) 460-8422.

78. Mr. Rashley's false statement that he consented to be contacted by Boost is material to Boost's fraudulent misrepresentation claim against Mr. Rashley.

79. Mr. Rashley knew that he didn't want to be contacted by Boost when he represented to Boost that it had his consent to contact him.

80. Mr. Rashley falsely represented to Boost that it had his consent to contact him in order to induce Boost to contact him.

81. Boost contacted Mr. Rashley at the real telephone number he provided in response to his representation that he consented to Boost contacting him.

82. But for Mr. Rashley's provision of consent to be contacted, Boost would not have contacted him.

83. On March 28, 2025, when Mr. Rashley visited Boost's website and provided consent to Boost for it to contact him, he represented that he understood that he may be contacted at the email address and/or telephone number he provided, including his wireless phone number (if provided) utilizing an automated telephone dialing system or robocall, even if he is on a government do-not-call registry.

84. Though Mr. Rashley did not provide all of the information required to complete the submission form, <u>other than his real telephone number</u>, the personal information he did provide was intentionally falsified.

85. On March 28, 2025, Mr. Rashley visited Boost's website from an IP address that was purposefully masked through the use of a VPN.

86. Upon information and good faith belief, Mr. Rashley knew that the use of the VPN would conceal the location of the computers or devices he used while accessing Boost's website on March 28, 2025.

87. This good faith belief is based on the fact that it is generally and publicly known that the use of a VPN conceals certain location and IP address information available on computers and other electronic devices.

88. In providing his real telephone number, Mr. Rashley affirmed his desire to receive communications from Boost at that telephone number, thereby completing the opt-in process.

89. By this conduct, Mr. Rashley also established a business relationship with Boost.

90. Mr. Rashley visited Boost's website just five days after Mr. Dungey visited the website on March 23, 2025 and just one day after Mr. Dungey received his final transactional text message from Boost.

91. On March 28, 2025, in reasonable reliance upon and pursuant to the consent provided by Mr. Rashley that day, Boost sent one transactional text message to the real telephone number he provided – (561) 460-8422. The text message merely inquired into whether assistance was needed to complete the submission form that Mr. Rashley had started but did not fully complete. The text message included a link to where the submission form could be completed.

92. After receiving the March 28, 2025 text message, Mr. Rashley did not inform Boost that he was on the National Do Not Call Registry and should not have been contacted. Had Mr. Rashley informed Boost that he was on the National Do Not Call Registry on March 28, 2025, Boost would not have sent any more text messages to him. Mr. Rashley did not inform Boost that he was on the National Do Not Call Registry because he wanted to receive more text messages from Boost.

93. After receiving the March 28, 2025 text message, Mr. Rashley did not contact Boost to revoke his consent to be contacted because he wanted to receive more text messages from Boost. By not revoking his consent to be contacted on March 28, 2025, Mr. Rashley intentionally

misrepresented to Boost that he did consent to being contacted. Had Mr. Rashley revoked his consent on March 28, 2025, Boost would not have sent any more text messages to him.

94. After receiving the March 28, 2025 text message, Mr. Rashley did not report the text message as Junk because he wanted to receive more messages from Boost. Had Mr. Rashley reported the text message as Junk on March 28, 2025, Boost would not have sent any more text messages to him.

95. On March 31, 2025, in reasonable reliance upon and pursuant to the consent provided by Mr. Rashley three days prior, Boost sent one transactional text message and a voice memo text message to the real telephone number he provided – (561) 460-8422. Those text messages also inquired into whether assistance was needed to complete the submission form that Mr. Rashley had started but did not fully complete. The text messages included a link to where the submission form could be completed.

96. After receiving the March 31, 2025 text messages, Mr. Rashley did not inform Boost that he was on the National Do Not Call Registry and should not have been contacted. Had Mr. Rashley informed Boost that he was on the National Do Not Call Registry on March 31, 2025, Boost would not have sent any more text messages to him. Mr. Rashley did not inform Boost that he was on the National Do Not Call Registry because he wanted to receive more text messages from Boost.

97. After receiving the March 31, 2025 text message and voice memo text message, Mr. Rashley did not contact Boost to revoke his consent to be contacted because he wanted to receive more text messages from Boost. By not revoking his consent to be contacted on March 31, 2025, Mr. Rashley intentionally misrepresented to Boost that he did consent to being contacted.

Had Mr. Rashley revoked his consent on March 31, 2025, Boost would not have sent any more text messages to him.

98. After receiving the March 31, 2025 text message, Mr. Rashley did not report the text message as Junk because he wanted to receive more messages from Boost. Had Mr. Rashley reported the text message as Junk on March 31, 2025, Boost would not have sent any more text messages to him.

99. On April 1, 2025, in reasonable reliance upon and pursuant to the consent provided by Mr. Rashley four days prior, Boost sent one transactional text message to the real telephone number he provided – (561) 460-8422.

100. After receiving the April 1, 2025 text message, Mr. Rashley did not inform Boost that he was on the National Do Not Call Registry and should not have been contacted. Had Mr. Rashley informed Boost that he was on the National Do Not Call Registry on April 1, 2025, Boost would not have sent any more text messages to him. Mr. Rashley did not inform Boost that he was on the National Do Not Call Registry because he wanted to receive more text messages from Boost.

101. After receiving the April 1, 2025 text message, Mr. Rashley did not contact Boost and revoke his consent to be contacted because he wanted to receive more text messages from Boost. By not revoking his consent to be contacted on April 1, 2025, Mr. Rashley intentionally misrepresented to Boost that he did consent to being contacted. Had Mr. Rashley revoked his consent on April 1, 2025, Boost would not have sent any more text messages to him.

102. After receiving the April 1, 2025 text message, Mr. Rashley did not report the text message as *junk* because he wanted to receive more messages from Boost. Had Mr. Rashley

reported the text message as Junk on April 1, 2025, Boost would not have sent any more text messages to him.

103. On April 3, 2025, in reasonable reliance upon and pursuant to the consent provided by Mr. Rashley six days prior, Boost sent one transactional text message to the real telephone number he provided – (561) 460-8422.

104. After receiving the April 3, 2025 text message, Mr. Rashley did not inform Boost that he was on the National Do Not Call Registry and should not have been contacted. Mr. Rashley did not inform Boost that he was on the National Do Not Call Registry because he wanted to receive more text messages from Boost.

105. After receiving the April 3, 2025 text message, Mr. Rashley did not contact Boost and revoke his consent to be contacted because he wanted to receive more text messages from Boost. By not revoking his consent to be contacted on April 3, 2025, Mr. Rashley intentionally misrepresented to Boost that he did consent to being contacted.

106. After receiving the April 3, 2025 text message, Mr. Rashley did not report the text message as Junk because he wanted to receive more messages from Boost.

107. That very same day, Dana Oliver, Esq. from the Heidarpour Law Firm (the same lawyer who just seven days earlier contacted Boost asserting claims on behalf of his client, Mr. Dungey) notified Boost of Mr. Rashley's almost identical TCPA and National Do Not Call Registry claims.

108. No telephone calls or pre-recorded messages were sent by Boost to Mr. Rashley's real telephone number – (561) 460-8422.

109. When visiting Boost's website on March 28, 2025, Mr. Rashley acknowledged his understanding that the submission of false information could subject him to liability.

110. When visiting Boost's website on March 28, 2025, Mr. Rashley falsely represented to Boost that he was interested in obtaining health insurance.

111. When visiting Boost's website on March 28, 2025, Mr. Rashley falsely represented that he consented to being contacted by Boost.

112. The fact that Mr. Rashley was on the National Do Not Call Registry on March 28, 2025 when he visited Boost's website confirms that his consent to be contacted was a misrepresentation.

113. Mr. Rashley's false statements in this regard were intended to induce Boost to rely on those statements and contact him about health insurance products, even though Mr. Rashley then knew he did not want health insurance products and did not want to be contacted.

114. Had Mr. Rashley not lied by representing that he consented to being contacted, Boost would not have sent the text messages that Mr. Rashley now complains of in this lawsuit.

115. By lying that he consented to being contacted, Mr. Rashley fraudulently induced Boost to contact him.

116. Boost contacted Mr. Rashley solely in reasonable reliance on his representation (which was a lie) that he consented to being contacted.

117. Had Mr. Rashley not lied, Boost would not be in the position of having to defend this lawsuit.

118. As a direct result of contacting Mr. Rashley in reasonable reliance on his intentional misrepresentations, Boost has and will continue to suffer reputational damages and will continue to incur attorney's fees and litigation expenses to defend itself in this lawsuit.

**WHEREFORE,** Counter-Plaintiff Boost Health Insurance Agency, LLC respectfully requests that this Court enter a judgment against Counter-Defendants: Rashley and Nicholas Dungey for:

(a) Compensatory damages in an amount to be determined;

(b) Punitive damages in an amount to be determined;

(c) An award of attorneys' fees and costs; and

(d) Any and all other relief deemed just and proper by the Court.

**DEMAND FOR TRIAL BY JURY**

Counter-Plaintiff, Boost Health Insurance, Inc. demands a trial by jury on all issues so triable.

Respectfully submitted,

By: /s/Nelson C. Bellido
NELSON BELLIDO
Florida Bar No. 974048
ROIG LAWYERS
201 S. Biscayne Blvd, 28th Floor
Miami, FL 33131
Telephone: (305) 405-0997
Facsimile: (305) 405-1022

*Attorneys for Boost Health Insurance, Inc.*