**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:25-cv-21690-KMW

KYLE BUTLER RASHLEY, *et al.*

Plaintiffs/Counterclaim Defendants,

v.

BOOST HEALTH INSURANCE AGENCY, LLC,

Defendant/Counterclaim-Plaintiff.

_______________________________________/

**MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION FOR PROTECTIVE ORDER OF NON-PARTIES, ANDREW HEIDARPOUR, ESQ., DANA OLIVER, ESQ. AND HEIDARPOUR LAW OFFICE PLLC**

Boost Health Insurance Agency, LLC ("Boost") (improperly identified in Plaintiffs' Complaint as Boost Health Insurance, Inc.) respectfully submits its Memorandum of Law in Opposition to the Motion for Protective Order of the Non-Parties Andrew Heidarpour, Esq. ("Attorney Heidarpour"), Dana Oliver, Esq. ("Attorney Oliver"), and Heidarpour Law Office PLLC ("HLF") (collectively referred to herein as the "Non-Parties").

## I. INTRODUCTION

The issue before the Court is straightforward. No question exists that both Plaintiffs submitted demonstrably false testimony to this Court in sworn Declarations that are word-for-word the same, drafted by their former counsel of record. Their submission of Declarations containing false statements, done with the assistance of their former lawyers, is perjury under the law. (DE 11-1, 11-2, attached as Exhibits 1 and 2 for the Court's convenience.) This constitutes both ***crime and fraud***.[1] The evidence, as detailed below, definitively establishes this.

[1] Under U.S.C. Section 1621, perjury is defined as:

The Plaintiffs thought they would not get caught committing fraud on the Court and that by doing so they would force a quick settlement payment from Boost. The question before the Court in connection with the pending Motion is whether their lawyers assisted, complied, knew or should have known about the Plaintiffs' lies, perjury and fraudulent scheme – such that the communications between the Plaintiffs and their lawyers are subject to disclosure pursuant to the crime-fraud exception to the attorney-client privilege.

The professional Plaintiffs (Counterclaim Defendants) and their attorneys have and continue to generate a well of manufactured Telephone Consumer Protection Act ("TCPA") cases for the sole purpose of making money – *with the lawyers taking almost all of it.* All the while, these serial TCPA class action plaintiffs: (i) sign over most of their consumer restitution rights to

---

"Whoever—

**(1)**
having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true; or

**(2)**
in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code, willfully subscribes as true any material matter which he does not believe to be true;

is guilty of perjury and shall, except as otherwise expressly provided by law, be fined under this title or imprisoned not more than five years, or both. This section is applicable whether the statement or subscription is made within or without the United States."

Fraud generally is defined as knowledge that the representation is false or made with reckless disregard for its truth (scienter); intent to induce another party to rely on the false statement; justifiable or reasonable reliance on the representation by the injured party; and resulting proximate damage.

the lawyers, (ii) fall outside of the zone of the protection of the law, and (iii) actually do want to receive calls so they can make money through the pattern of crime and/or fraud. They work in concert together to file class action lawsuits with the threat of substantial defense costs in order to increase the price of individual settlement demands – while no putative class members are ever protected.

***Enough is enough.***

Boost respectfully requests an opportunity through discovery to get to the bottom of this obvious coordinated strategy and improper conduct. Little question exists that Plaintiffs' lawyers know what is going on and, for quite some time, have actively participated in it and abused the Court process to further their sole benefit and at the expense of others who operate businesses in good faith. The conduct at issue and the discovery now sought fits squarely within the black letter law of the crime-fraud exception. Where, as is the case here, a client uses an attorney's services or advice to commit, plan, or further crime or fraud, the attorney-client privilege will not shield the communications between the client and attorney.

## II. BACKGROUND

On August 6, 2026, Boost served three subpoenas on Attorney Heidarpour, Attorney Oliver, and the HLF (individually "Subpoena" or collectively "Subpoenas"), each attaching Exhibit A requests. (DE 55-1). After serving Objections, self-serving narratives about the law and meaningless responses, the Non-Parties moved for a protective order on September 24, 2026. (DE 55).

The Subpoenas requested production by September 2, 2026. The Non-Parties responded on September 2, 2026, but provided no substantive response, nor any privilege logs. The Non-Parties contended that the Subpoenas were so broadly asserted that any production of

nonprivileged materials would be unduly burdensome. Specifically, the Non-Parties estimated that 70,000 pages would need review, organization, and cataloging. Counsel for the parties conferred by phone and email on September 11, 17, 22, and 23, 2026, but the Non-Parties maintained their objections and sought judicial intervention to quash or limit the Subpoenas. The parties could not reach a resolution related to production, although Boost agreed to continued conferral in an effort to narrow the issues now before the Court. Boost continues to maintain that commitment, but does not agree that the Subpoenas should be withdrawn and/or quashed.

## III. <u>APPLICABLE LEGAL STANDARD</u>

While the traditional standards under Rule 26(b)(1) apply, the primary issue now before the Court is the applicability of the crime-fraud exception. The crime-fraud exception specifically allows parties to obtain discovery that otherwise would be protected by the attorney-client privilege or the attorney work product doctrine. *Drummond Co., Inc. v. Conrad & Scherer, LLP*, 885 F.3d 1324, 1335 (11th Cir. 2018). Indeed, *Drummond* confirms that the Eleventh Circuit applies the crime-fraud exception in civil discovery, ***including where the subpoenaed person/entity is an attorney and/or a law firm***. *Id*.

Moreover, the law merely requires a preliminary showing of a factual basis and good faith belief that discovery materials *could* reveal that the crime-fraud exception applies.[2] Such a showing is made here and was previewed by Judge Williams during the hearing held on August 19, 2026. As is described in more detail below, the totality of: (i) Nicholas Dungey's ("Dungey") and Kyle Rashley's ("Rashley") many nearly identical prior TCPA cases, (ii) the numerous calls between them in the weeks leading up to the alleged unsolicited text messages, (iii) the

[2] *United States v. Zolin,* 491 U.S. 554, 572 (1989). See also *In re Coll. Landings Ltd. P'ship,* 248 B.R. 619, 623 (Bankr. M.D. Fla. 1998) (holding that a *prima facie* showing does not require proof of the crime or fraud itself).

representation of each of them in many prior cases by Attorney Heidapour, Attorney Oliver and Avi Kaufman, Esq. ("Attorney Kaufman"), and (iv) the numerous calls between Plaintiffs and the HLF leading up to the alleged unsolicited text messages – certainly sets forth a *prima facie* showing that they were all involved together in the fraud. The HLF knowingly assisted Dungey and Rashley in the fraud and sent them to Attorney Kaufman who carried out the fraud by filing this lawsuit. Tellingly, but not surprisingly, as soon as the crime-fraud was exposed, Plaintiffs' attorneys jumped ship and abandoned their clients on the eve of Rashley's deposition.

## IV. <u>ARGUMENT</u>

### a. <u>The Subpoenas seek relevant, proportional discovery that is not shielded by the attorney-client privilege.</u>

The Non-Parties argue that the Subpoenas are overly broad and unduly burdensome. Such is not the case. The requests in each Subpoena specifically target the perjury and fraud committed by Rashley and Dungey in this case, and the extent to which their lawyers engaged in acts to further this demonstrable perjury and fraud. The Subpoenas also include ***date-limited*** communications, specific phone numbers associated with the Plaintiffs, and communications with their coordinating counsel, who have been known to engage in fraudulent conduct, as elucidated in greater detail below. In sum, the Subpoenas seek information specifically related to the perjury which is a crime and fraud.

Indeed, the starting point is the Non-Parties' argument that Boost fails to make the required *prima facie* showing that the crime-fraud exception applies. That argument lacks merit. The Affidavit submitted by Attorney Heidarpour in the Objections to ***all three Subpoenas*** actually demonstrates the contrary. He attests that he has handled approximately 1,000 TCPA claims since May, 2022, and has worked with Attorneys Avi and Rachel Kaufman to refer cases to them for the last five years. (DE 55-2 at ¶¶ 4, 7). Attorney Heidarpour also represented that he has represented

Rashley at least sixteen times and Dungey twenty-five times, including in the present case. *Id.* at ¶¶ 9, 12.

The record and Attorney Heidarpour's own Affidavit corroborate the fact that a *prima facie* showing of crime and fraud exists. This case is nothing but a continuation of the coordinated and repeated scheme of Plaintiffs to commit fraud by entering false information on a marketing site to invite a contact, which is then used as the basis for a TCPA class action lawsuit – one in which neither Rashley, Dungey nor their attorneys ever intended to protect others similarly situated. Attorney Heidarpour's statements in the Affidavit demonstrate his knowledge of and involvement in this grand scheme. The Affidavit references his involvement in prior TCPA cases where Dungey and Rashley served as named Plaintiffs – none of which ever appear to have been prosecuted as a class action. The authenticated and verified telephone records for Dungey and Rashley show numerous calls between them and the Non-Parties in the weeks and months ***immediately leading up*** to the alleged unsolicited text messages. Without question, this repeated fact pattern sets forth a *prima facie* showing that Attorney Heidarpour and/or his independent contractor, Attorney Oliver, knowingly assisted Dungey and Rashley in the underlying fraud that generated the text messages which were used as the basis for this case.

Though the Non-Parties have had long-standing relationships with Rashley and Dungey, Attorney Heidarpour further attests that his representation of Rashley in this case commenced on April 9, 2025 and his representation of Dungey in this case commenced on April 11, 2025. On August 12, 2026, Attorney Heidarpour terminated his representation of Rashley and Dungey in this case. *Id.* at ¶¶ 10, 13, 14.

This background sets the stage for the tangled web woven among these attorneys and their repeat professional Plaintiffs, who have demonstrated the same pattern and practice for many

years. Indeed, the same facts recur over and over again – the pattern of fraud is not a coincidence nor is it limited to just this case. The pattern goes as follows: (i) a company (soon to be the defendant) receives a letter/email from either Attorney Heidarpour and/or Attorney Oliver advising they have a client who has been contacted without consent and requesting evidence of consent (the "form letter or email"), (ii) Attorney Heidarpour and/or Attorney Oliver thereafter rebuke any investigation demonstrating consent, and (iii) the imminent forwarding of the matter to Attorney Kaufman who files a TCPA class action lawsuit.

As just a small sampling of this, Boost directs the Court's attention to several examples. *See e.g.:*

- *Rashley v. Patriot Health Florida, Inc*. (S.D. Fla.) – in that case, Attorney Oliver sent the form email to Patriot Health on April 17, 2025; just twenty days later, Attorney Kaufman filed a TCPA class action lawsuit on behalf of Rashley; (Case No. 25-cv-80558-DSL, DE 1)
- *Andrew Duncan Suess v. MFP Agency, LLC d/b/a Total Health* (M.D. Fla.) – in that case, Attorney Heidarpour sent the form email to MFP Agency on June 20, 2024 (attached hereto as Exhibit 3); soon thereafter on August 19, 2024, Attorney Kaufman filed a TCPA class action lawsuit on behalf of Mr. Suess; (Case No. 6:24-cv-01504-PGB-LHP, DE 1)
- *Andira Fox v. MFP Agency, LLC d/b/a Total Health* (M.D. Fla.) – in that case, Attorney Oliver, in the middle of the email thread related to Mr. Suess' claims, sent the form email to MFP Agency on July 1, 2024, with a follow up on June 14, 2025 (Exhibit 3); Attorney Kaufman filed a TCPA class action lawsuit on behalf of Ms. Fox on September 6, 2025; (Case No. 8:25-cv-02396, DE 1)

- *Arthur Cochran v. Boost Health Insurance Agency, LLC* (N.D. Fla.) – in that case, Attorney Heidarpour sent the form email to Boost on October 13, 2023; just eighteen days later, Attorney Kaufman filed a TCPA class action lawsuit on behalf of Mr. Cochran on October 31, 2023; (Case No. 4:23-cv-00473-MW-MJF)

Here, the same blueprint was followed. Within just five days of each other in March, 2025, Rashley and Dungey each visited Boost's first party website, provided their real telephone numbers, consented to being contacted, and identified themselves using aliases.[3] Then, on March 27, 2025, using doliver.heidarpourlawfirm@gmail.com, Attorney Oliver sent the form email to Boost regarding Dungey's contact. Just days later on April 3, 2025, in the same email thread regarding Dungey's claim, Attorney Oliver notified Boost of Rashley's contact. (Exhibit 3)

After internal investigation and response by Boost that proper consent had been collected by persons identified as John Renoylds (the alias used by Rashley) and Thomas Murphy (the alias used by Dungey), Attorney Oliver responded only to admit he was aware of Dungey's telephone number having an association with Thomas Murphy. (Exhibit 4). To be expected, Attorney Oliver and Attorney Heidarpour quickly punted the matter to Attorney Kaufman who, on April 12, 2025, continued the perpetuation of the fraud by filing this lawsuit. (DE 1)

***This is not a coincidence.***

The consistent sequence of events is unvarying, as evidenced by these Plaintiffs initiating at least nine lawsuits against other insurance companies within the brief period from April 12, 2025 to May 14, 2025. (First Amended Counterclaim at ¶ 19). This calculation represents only a fraction of their activity, which does not account for all of their lawsuits and, presumably, other

[3] Dungey visited Boost's website on March 23, 2025 and Rashley visited the website on March 28, 2025. (*See generally* Boost's First Amended Counterclaim)

demands sent by Attorney Heidarpour and/or Attorney Oliver that were resolved without the need for a lawsuit. Moreover, within the last three years Attorney Kaufman has filed more than **260** TCPA class action lawsuits in Florida federal district courts, alone. Indeed, some, if not many, of those cases came from Heidarpour and Oliver. (Exhibit 5).

Most notably, and of guidance to the Court, attached is the transcript of recent federal court proceedings in Oregon from *Wilson v. Freeway Insurance Services of America, LLC*, which is a very similar TCPA case involving another serial TCPA litigator and the same Non-Party lawyers. The issues raised in that case demonstrate that the Non-Party lawyers involved work together with a well of the same serial TCPA plaintiffs, while grossly overcharging those plaintiffs and using judicial extortion to garner large individual settlements – without regard to ever protecting any putative class representatives, the spirit of the law, or even their named-plaintiff clients. (Exhibit 6).

In *Wilson*, the Court stated on the record that it was ***"starting to be concerned about ethical issues from some of the attorneys involved [and] . . . whether criminal fraud is taking place" and ordered extensive discovery into the activities of Chet Wilson, the Heidarpour Law Firm, and related TCPA litigation, including preservation of electronic evidence and potential forensic examination of devices."*** *Wilson v. Freeway Insurance Services of America, LLC*, No. 6:25-cv-01869-MC, Tr. of Oral Arg. at 42-43 (D. Or. Aug. 19, 2026) (McShane, C.J.).

Moreover, the transcript from the hearing on record in *Wilson,* reveals the following testimony, which is illustrative here:

> ***"the class allegations serve one purpose in this type of case, supplying leverage for a large individual settlement"***

(Exhibit 6, p 7).

> ***"by combining the leverage with the fee agreements that we've discovered in this case and the terms that are in those fee agreements, the lawyers have designed a mechanism really unlike anything we've ever seen before: A mechanism to extract more from a statute where Congress says fees are not permitted than from a fee-shifting statute, a way to get larger hourly payouts".***

(Exhibit 6, p. 8).

In denying class certification based upon the totality of the circumstances, including concerns regarding adequacy, typicality, and the manner in which these cases were being prosecuted, Judge McShane noted on the record:

> ***"I was born at night, not last night. Mr. Wilson and the lawyers who represent him are making a cottage industry out of this. Do not tell me that Mr. Wilson is up at night thinking, 'Oh, my God, I got a robocall.' He's calling the law firm saying, 'Oh, my God, I got a robocall. Cha-ching.' Please don't take me for an idiot up here."***

(Exhibit 6, p. 44).

In this case, the conduct follows this exact same playbook. While the Non-Parties contend that an allegation of perjury is categorically insufficient, the courts within the Eleventh Circuit expressly recognize that the crime/fraud exception encompasses both perjury and obstruction. *United States v. Cleckler,* 265 F. App'x 850, 854 (11th Cir. 2008); see also *Christenbury v. Locke Lord Bissell & Liddell, LLP,* 285 F.R.D. 675, 686 (N.D. Ga. 2012). The two-part test requires showing (1) that the client was engaged in or planning criminal or fraudulent conduct when seeking counsel's advice, and (2) that the communication was made in furtherance of or closely related to that conduct. *Drummond Company, Inc.* at 1335.

Indeed, this is not anything novel and other federal district courts have addressed very similar scenarios. *See e.g, Navient Sols., LLC v. Law Offices of Jeffrey Lohman, P.C.*, Case No. 19-461, 2020 WL 1172696, at *1 (E.D. Va. Mar. 11, 2020) (Attorney Lohman was ordered to produce his law firm's communications with certain clients based on the crime-fraud exception,

which overcomes the attorney-client privilege where a lawyer participates in fraud to generate TCPA claims.)

Here, Dungey's deposition and related evidence reveal that, under penalty of perjury, both Plaintiffs provided materially false sworn testimony to this Court concerning their communications with each other. Specifically, both Plaintiffs executed Declarations (prepared with assistance of their counsel) stating ***"I do not know my co-plaintiff, and I have not met or communicated with him."*** See Transcript of the Deposition of Nicholas Dungey ("Dungey Dep.") 14:13-23 (Aug. 3, 2026), being filed separately with the Court.[4] The submission of verbatim Declarations by two individuals who have never met or communicated is highly improbable. This uniformity is clearly explained, however, by the fact that they are represented by the same attorneys.

During his deposition, Dungey confirmed that he did not know Rashley and that he had not met him or communicated with him. He affirmed that the statement in his Declaration referring to Rashley was true. He acknowledged that the Declaration bore his signature and admitted that he signed the Declaration under penalty of perjury. *Id.* at 42:14-25, 43:1-2. He further testified that he understood perjury meant lying and that the Declaration was a sworn statement. *Id.*

Despite these sworn representations, ***unchallenged and verified telephone records subpoenaed from Verizon*** for the Plaintiffs' various phone numbers show, in black and white, that the Plaintiffs lied. *See* certified Verizon Records, attached as Exhibit 7 (for Rashley) and Exhibit 8 (for Dungey).[5] The Verizon records were attested to be authentic and accurate reflections of communications between Plaintiffs and were not contested by Dungey at his deposition. His phone

---

[4] Dungey was represented by counsel at this deposition.

[5] Dungey's phone numbers are (561) 943-0417 and (305) 776-8306. Rashley's phone number is (561) 460-8422. The HLF's phone number is (202) 234-2727.

records show extensive communications with the HLF ***before*** Attorney Heidarpour even began his engagement with Dungey on April 11, 2025. In just the three week period between March 19, 2025 and the April 11, 2025 engagement, there were fifty one (51) calls between Dungey and the HLF. This presents much more than just a suggestion that ***Plaintiffs spoke with the Non-Parties about Boost and their planned fraudulent scheme before they ever received contact from Boost.*** The Non-Parties knew or would have had very good reason to know that Plaintiffs intended to solicit telephone/text contact in order to manufacture TCPA claims against Boost, and assisted them in this fraud.

Attorney Heidarpour swore (under oath) in his Affidavit that he began his engagement with Rashley in this case on April 9, 2025. Between January 28, 2025 and April 8, 2025, however, there were sixteen (16) phone calls between them. One may only surmise what they discussed during that time period if their engagement had not yet begun and Rashley did not receive his first text message until March 28, 2025. Between January 28, 2025 and March 27th (the day ***before*** the first text message), there were five calls between Rashley and the HLF.

Between March 19, 2025 and March 23rd (the day ***before*** the first text message), there were six (6) calls between Dungey and the HLF. On the day Dungey received the first text message, there were fourteen (14) calls between him and the HLF.

Dungey visited Boost's site on March 23, 2025. Between March 23rd and April 3rd (which is the date Attorney Oliver sent the form email to Boost about also representing Rashley), there were thirty seven (37) calls between Dungey and the HLF.

Rashley visited Boost's site on April 3, 2025. Between March 22nd and April 3rd, there were ten (10) calls between Rashley and the HLF. Between March 14th and March 27th (**before**

Rashley first went to the site on March 28th), there were eight (8) calls between Rashley and Dungey.

Between January 1, 2025 and the commencement of Attorney Heidarpour's engagement with Dungey on April 11, 2025, there were sixty five (65) calls between Dungey and Rashley. This information is remarkable given that in both of their Declarations, Dungey and Rashley swore under penalty of perjury, that they have never communicated with each other. The number of calls during that time period speaks for themselves. The totality of these facts raises more than a *prima facie* showing necessary for the application of the crime-fraud exception.

Moreover, Rashley's telephone records show at least twenty telephone interactions with Dungey where Rashley used a pre-paid cellular phone (also referred to as a "burner" telephone). Dungey's telephone records would not show such a contact because Rashley's telephone was pre-paid and not part of a subscription plan. These communications occurred between February 18, 2025 and March 23, 2025 – right before the first text message from Boost was received. Furthermore, the telephone records show numerous calls between Rashley and the HLF in the weeks immediately preceding the receipt of the alleged unsolicited text messages.

Given these facts, it is evident that the sworn Declarations of Plaintiffs are categorically false and entirely inconsistent with objective third-party evidence that has not been refuted. At a minimum, these discrepancies raise substantial questions regarding the truthfulness of Plaintiffs' sworn Declarations and whether Plaintiffs knowingly provided false testimony concerning a material issue in the case, and with the assistance of counsel. As Dungey's deposition establishes, his Declaration was prepared with assistance of his counsel. *Id.* at 13-14.

These issues are directly relevant to fraud, credibility, adequacy of class representation, the relationship between the Plaintiffs, and the circumstances under which the lawsuit was filed.

Given these circumstances, a legitimate factual basis exists for further discovery and not for the limitation of discovery requested through the protective order.

**b. <u>The Objections to overbreadth and burden do not warrant quashing the Subpoenas.</u>**

In their written responses, and in direct violation of Local Rule 26.1(e)(2)(A), the Non-Parties asserted nonspecific, boilerplate objections to nearly every request, improperly declaring them vague, overbroad, and outside the scope of discovery without providing the required specificity. Further, the Non-Parties assert privilege without providing a log, which is yet another violation of this Court's Rules. Specifically, the Non-Parties objected to Request No. 1 as vague, overly broad, unreasonable in scope, and not reasonably calculated to lead to admissible evidence. The Non-Parties objected similarly to Request No. 2 and asserted disproportionality. Comparable boilerplate objections were repeated across the remaining requests in the Non-Parties' responses.

This pattern, combined with the absence of any privilege log, is legally insufficient and warrants an Order compelling compliance. Moreover, the time frame for the requested documents of January 2025 through August 12, 2026 is appropriate and proportionate to the needs of this case. As noted above, the crime-fraud scheme they were all involved in was ongoing and started, at least, in January 2025. Furthermore, August 12, 2026 is the appropriate end date because that is when Attorney Heidarpour terminated his engagements with Rashley and Dungey.

A non-party asserting undue burden has the burden of proof to demonstrate that compliance with the subpoena would be unreasonable and oppressive. *Goodman-Gable-Gould Co., Inc. v. Tiara Condo. Ass'n, Inc.*, No. 06-80441-CIV, 2007 WL 9701950, at *3 (S.D. Fla. Apr. 6, 2007). A non-party cannot simply label a subpoena as burdensome or overbroad — it must specify how producing the documents would actually be burdensome. *In re Application of MTS Bank,* No. 17-21545-MC, 2017 WL 3276879, at *13 (S.D. Fla. Aug. 1, 2017).

Courts in the Eleventh Circuit compel compliance with non-party subpoenas even over undue burden and overbreadth objections where the objector fails to carry its burden. Illustrative is *Gamache v. Hogue*, where the court found that a subpoena did not impose undue burden on an attorney-deponent after weighing the deponent's status, the relevance of the information, and the burden imposed by enforcing the subpoena. *Gamache v. Hogue*, 595 F. Supp. 3d 1344, 1348 (M.D. Ga. 2022).

The undue burden question in *Gamache* arose when plaintiffs sought to enforce a subpoena against Moore, the Board's attorney, who was a nonparty to the litigation. The court applied a multi-factor test to determine whether the subpoena imposed an undue burden. "To determine whether a subpoena imposes an undue burden, courts consider several factors, including the: (1) deponent's status as a party or nonparty, (2) 'relevance of the information requested,' and (3) burden imposed by enforcing the subpoena." *Gamache* at 1355. In that case, under the first factor, Moore's status as a nonparty weighed against enforcement of the subpoena, as non-party status is a factor to be considered in determining whether the burden imposed by a subpoena is undue. *Id.* However, despite Moore's nonparty status, the court found that the second factor — relevance — heavily weighed in favor of enforcing the subpoena. Ultimately, the court found no undue burden on the subpoena because the relevance of Moore's communications and outweighed the burden imposed by his nonparty status, making enforcement of the subpoena appropriate. *See Id.* at 1357.

Similarly, in *Dyer v. Coloplast Corp.*, the court compelled production from a non-party surgeon after finding the subpoena was not unduly burdensome and the information was discoverable. *Dyer v. Coloplast Corp.*, 806 F. Supp. 3d 1329, 1332 (M.D. Fla. 2025). In *Dyer*, the court found that a subpoena requiring a non-party pelvic surgeon to produce documents relevant to patient's negligence and products liability suit against surgical mesh implant manufacturer was

not unduly burdensome, despite surgeon's contention that responding to subpoena required manually searching every patient file, and it was likely that surgeon could obtain the information from his medical biller without actually searching patient files. Ultimately the court found that the undue burden argument lacked merit. *Id.* at 1336.

Like in *Gamache* and *Dyer*, the Non-Parties cannot show that the requests are unduly burdensome or overbroad. The Non-Parties' overbreadth and burden objections lack merit. The targeted discovery seeks information directly relevant to critical issues in this case, including fraud, liability, class elements, consent, standing, and credibility. Their claim that reviewing **70,000 pages** is too onerous is meritless, as are their complaints regarding the monetary costs of preparing a privilege log do not shield them from their discovery obligations.

Moreover, simply stating a review of 70,000 pages is necessary to identify responsive documents does not meet the burden. This is a complex TCPA case with counterclaims that is further complicated by alleged perjury. Two named plaintiffs filed a complex class action, counterclaims are being pursued, and multiple attorneys are involved. Voluminous records are to be expected and that does not relieve the Non-Parties of their obligation to provide relevant, non-privileged information. The relevance of the Non-Parties' communications with the Plaintiffs and the fraud claims against them outweighs the blanket assertion that complying with the Subpoenas would impose a burden.

Boost has consistently stated that it is not interested in privileged materials unrelated to this action and acknowledged that a privilege log could solve any volume concerns, showing a willingness to tailor and focus discovery. Boost only seeks materials related to this case. Notwithstanding the volume of documents, the relevance outweighs any burden.

Where privilege is invoked, the appropriate mechanism is a compliant privilege log and, if disputes persist, an *in camera* review addressing the disputed categories. The parties' correspondence acknowledges *in camera* review as a potential tool. Indeed, *in camera* review was specifically mentioned by Judge Williams during the August 19, 2026 hearing addressing these issues. The Non-Parties' request to quash the Subpoenas in their entirety overreaches and is unnecessary to protect any legitimate interest.

**c. The availability-from-other-sources contention also lacks merit.**

The Non-Parties suggest that Boost failed to identify the "correct recipient" or to narrow requests sufficiently, but they do not demonstrate that the requested documents are accessible from parties or other sources with less burden. They claim Boost failed to narrow requests and may have misidentified the correct recipient. The Subpoenas seek the Non-Parties' own communications and files concerning Plaintiffs, specific numbers associated with Plaintiffs, and evidence preservation instructions – materials uniquely within the Non-Parties' possession and not necessarily available from Boost or third parties. The Non-Parties' same objections across three substantively identical subpoenas underscore that responsive, probative materials exist but have been categorically withheld.

**d. Meet-and-Confer efforts took place and Boost offered a narrowing of the Subpoenas, which was rebuffed by the Non-Parties.**

The record reflects multiple conferrals and Boost's efforts to address privilege and burden while maintaining access to relevant, non-privileged materials. Counsel conferred on September 11, 17, 22, and 23, without resolution. The Non-Parties asserted undue burden, and Boost declined to reissue modified subpoenas due to impending case deadlines. Boost also clarified that it was not seeking privileged materials unrelated to this action and recognized the volume concern for privilege logs, indicating willingness to sequence and narrow. Given the approaching close of

discovery, targeted court-ordered limitations, not quashing, are appropriate to keep discovery on track. The Court set a discovery cutoff of December 4, 2026.

## V. CONCLUSION

The Non-Parties fail to carry their burden to show good cause for a protective order quashing the Subpoenas. The requests are relevant and proportional, and any legitimate confidentiality or burden concerns can be addressed through targeted limitations, production of non-privileged materials, and the privilege log requirement. Boost respectfully requests that the Court deny the Motion for Protective Order, compel production based on the crime-fraud exception to the attorney-client privilege, compel the production of a compliant privilege log by October 14, 2026, and, if necessary, order an *in camera* review as deemed appropriate by the Court.

Respectfully submitted,

By: /s/Nelson C. Bellido
NELSON BELLIDO
Florida Bar No. 974048
ROIG LAWYERS
201 S. Biscayne Blvd, 28th Floor
Miami, FL 33131
Telephone: (305) 405-0997
Facsimile: (305) 405-1022
nbellido@roiglawyers.com

- And -

By: /s/ Lisa A. Messner
Lisa A. Messner
(*Admitted Pro Hac Vice*)
Mac Murray & Shuster, LLP
6525 West Campus Oval, Suite 210
New Albany, Ohio 43054
(614) 939-9955, (614) 939-9954
lmessner@mslawgroup.com

*Attorneys for Boost Health Insurance Agency, LLC*